UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

ANTHONY RAY JOHNSON,                    )
                                       )
              Plaintiff,               )
                                       )          No. 1:12-cv-66
v.                                     )
                                       )          *Collier / Lee*
COMMISSIONER OF SOCIAL SECURITY,       )
                                       )
              Defendant.               )

## REPORT AND RECOMMENDATION

Plaintiff Anthony Ray Johnson brought this action pursuant to 42 U.S.C. §§ 405(g) seeking

judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or

"Defendant") denying him disability insurance benefits ("DIB"). Plaintiff has moved for judgment

on the pleadings [Doc. 10] and Defendant has moved for summary judgment [Doc. 12]. Plaintiff

alleges the Administrative Law Judge ("ALJ") failed to evaluate the evidence to determine whether

Plaintiff met a Listing, did not adequately address his impairments in combination, and did not pose

an appropriate hypothetical question to the vocational examiner ("VE"). For the reasons stated

below, I **RECOMMEND** that (1) Plaintiff's motion for judgment on the pleadings [Doc. 10] be

**GRANTED IN PART** to the extent it seeks remand to the Commissioner and **DENIED IN PART**

to the extent it seeks reversal and an award of benefits; (2) the Commissioner's motion for summary

judgment [Doc. 12] be **DENIED**; and (3) the Commissioner's decision denying benefits be

**REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g).

## I.     ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed his application for DIB on July 2, 2009, alleging disability as of May

21, 2008 (Transcript ("Tr.") 131-33). Plaintiff's claim was denied initially and upon reconsideration

and he requested a hearing before the ALJ (Tr. 75-85, 88). The ALJ held a hearing on July 26, 2010, during which Plaintiff was represented by an attorney (Tr. 26-74). The ALJ issued his decision on August 24, 2010 and determined Plaintiff was not disabled because there were jobs in significant numbers in the economy which he could perform (Tr. 12-22). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-7). Plaintiff filed the instant action on March 16, 2012 [Doc. 1].

## II.     FACTUAL BACKGROUND

### A.     Hearing Testimony

Plaintiff was 40 years old at the time of the hearing and had completed high school and approximately 12 hours of college courses (Tr. 33-34). Plaintiff had worked in the military in communications for approximately seven years and had been a mechanic for the Army for the last four years of his military service (Tr. 32). Plaintiff's military duties ceased on May 21, 2008, his alleged onset date, and Plaintiff left the military in June 2010 (Tr. 41).

During his first tour of duty in Iraq, Plaintiff was in the third truck of a convoy when an improvised explosive device ("IED") exploded between the first and second trucks; as a result of the explosion, Plaintiff was the victim of a percussion blast which caused temporary memory loss and migraine headaches (Tr. 41-42). Plaintiff testified he often forgets things that happened recently and the effects from the blast became progressively worse leading him to make mistakes during his second deployment (Tr. 42-43). For example, Plaintiff forgot his weapon in a truck twice, which is considered a major offense. Such incidents of forgetfulness and his post traumatic stress disorder ("PTSD") resulted in Plaintiff's medical retirement from the military (Tr. 43-44). Plaintiff spent 18 months in the hospital at Fort Gordon for treatment of his back problems and PTSD (Tr. 45).

Plaintiff testified he could not work because of his back and hip pain, severe migraines, problems with his left shoulder, and degenerative arthritis in his hips and knees (Tr. 32-33). Plaintiff had previously had a steroid injection in his knees which only helped at first (Tr. 54). He had also had five injections in his back and one radio frequency ablation; none of these treatments helped (Tr. 54-55). Plaintiff testified his physical therapist had recommended the use of a cane in February or March 2010 and that he needed the cane to walk but could stand without it; the cane was recommended due to Plaintiff's back pain and because certain medications made him unstable (Tr. 30-31). Plaintiff testified he could stand for about five to seven minutes before lower back pain caused him to stop, and could only walk for 15 to 20 yards before stopping, even with the cane (Tr. 35). Plaintiff stated he could not lift more than 20 or 25 pounds (Tr. 35). Plaintiff testified he could not sit for more than 30 minutes without experiencing back pain, and would need a break of 10 to 15 minutes before sitting again (Tr. 35). When asked whether he could perform a job that had a sit/stand option, Plaintiff testified he was not sure he could because Neurontin, Trazodone and Cymbalta made him sleepy (Tr. 37-38). Plaintiff testified he was having difficulty sleeping, so the doctors at Fort Gordon prescribed medicine to help him sleep; as a result of these medications, he was now sleepier and groggier during the day (Tr. 38). Plaintiff also experienced "ghosting"meaning he saw something and a shadow of that thing; this occurred most often in the morning and his doctors had no explanation for it (Tr. 55-56). Plaintiff also had plantar fasciitis, which caused painful, tingling and numb feet (Tr. 56-57). Plaintiff never had a day with zero pain and said the lowest pain he experienced on a scale of one to 10 was a four during the daytime, and as the day progressed, his pain would increase (Tr. 46). Pain sometimes woke him up at night and he could not get back to sleep (Tr. 46-47).

Plaintiff further testified he had left shoulder surgery which left him with limited mobility and pain in his left arm (Tr. 44-45). Plaintiff had injured his shoulder lifting large military tires (Tr. 54). Plaintiff's migraine headaches would last for up to two days and he could only reduce the length of the migraine with his medication, so at the very least the migraine would last one day (Tr. 47-48). Plaintiff could not work if he had a migraine and testified he had two or three migraines a month (Tr. 48). Plaintiff was sick to his stomach every time he had a migraine and sometimes threw up (Tr. 48). Plaintiff stated he also had sand in his lungs from the war, which was essentially adult asthma (Tr. 49).

Plaintiff reported losing his temper frequently since his return home and had punched holes in walls and broken chairs (Tr. 49). Plaintiff had experienced suicidal thoughts, including a plan to carry out the suicide, within the last two to three weeks, and had previously had homicidal thoughts about one doctor who treated his back problems (Tr. 50-51). His homicidal thoughts had since resolved, but Plaintiff testified he had those thoughts because the doctor was condescending about Plaintiff's learning to live with back pain (Tr. 51). Plaintiff had been "locked up" twice for his suicidal and homicidal thoughts, once for eight or nine days and once for two to four days; he still had those thoughts, but did not have them consistently, i.e., every day (Tr. 58-59). Plaintiff did not have a suicidal plan on the day of the hearing (Tr. 59). Plaintiff further testified he could not be around a lot of people and had frequent crying spells that would last from a few minutes up to 30 minutes (Tr. 53-54). Plaintiff thought he would probably miss work at least two or three days a week due to his migraines, back pain, and hip pain (Tr. 51-52).

Plaintiff was married and lived with his wife and 15-year-old child in a double wide trailer with steps going out the front and back doors; Plaintiff testified he tried to leave his home as little

as possible because going up or down the stairs hurt his hips and knees (Tr. 34). Plaintiff's wife and son did most of the chores around the house and he did not help with chores; he did help with the cooking occasionally but he could not go shopping due to the standing and walking (Tr. 39). Plaintiff had a small pool outside his home and would sometimes walk back and forth in the pool for 30 minutes (Tr. 39-40). Plaintiff testified he had very few interests and spent most of his time sitting and staring with the TV on as background noise (Tr. 40). Plaintiff had no motivation to get out and do anything (Tr. 40). Plaintiff did not engage in sports activities with his son, but stated they had a good relationship and he helped his son with homework and they often talked (Tr. 57-58).

### B. Vocational Expert Testimony

The ALJ sought the testimony of VE Mark Leaptrot (the "VE") during the hearing. The ALJ asked the VE to assume an individual 40 years of age with a high school education who could generally perform light work as it pertained to lifting and carrying but needed a cane to walk, could not frequently or repetitively perform standing functions like stooping or crouching, could not reach overhead with the left arm, required a sit/stand option so he would not have to walk/stand or sit for more than 10 minutes at a time, could not work at unguarded heights or near dangerous machinery due to side effects from medication, and could not maintain focused attention to detail (Tr. 60-61). The VE testified that an individual with these limitations could work as an information clerk, with 7,300 jobs in Georgia and at least 500,000 in the nation; a box sealer/inspector, with 7,500 in the region and at least 400,000 nationally; or an inspector of electrical components, with 8,600 jobs in the state and at least 467,000 in the nation (Tr. 61-62). The VE testified that absenteeism of three days a month would likely be excessive, and consistent absenteeism of three or two days every month, month after month, would likely affect the individual's ability to remain employed (Tr. 62-

66).  Furthermore, two 20 to 30 minute breaks and an hour for lunch each day would be excessive and would likely result in an inability to be competitive for the job (Tr. 63-64).

The ALJ and the VE engaged in a conversation to clarify that although the jobs were listed under light work, they might also accommodate the option to perform the work in a sedentary manner (Tr. 66-69).  The VE testified that if the hypothetical individual could stand no more than two to four hours a day, it would not change the number of jobs available because the positions identified generally involved the option to sit or stand at will (Tr. 69-70).  The VE further identified weaver defect clerk as a sedentary job which the hypothetical individual could perform and stated there were 4,900 positions in the region and at least 160,000 in the nation; the VE testified he could have provided more sedentary examples as well (Tr. 71).  The VE also testified that an individual would generally be expected to give good attention and concentration for at least two hour blocks of time, and if the hypothetical individual was forgetting important factors of the job, it could affect his ability to work (Tr. 72-73).

### C.    Medical Records

#### 1.    Physical Records

Plaintiff was seen at Chattanooga Bone & Joint in 2006 complaining of left shoulder pain.  A March 2006 MRI of his shoulder was normal and Dr. Martin Redish treated him conservatively for approximately six months before considering surgery; in December 2006, Plaintiff's was referred by Dr. Redish to a different physician (apparently named Dr. D. Bruce) for a second opinion (Tr. 298-300).  Dr. Bruce performed a physical examination, finding mild results and normal rotational strength and Dr. Bruce noted he did not see any reason Plaintiff could not work, as he had a similar shoulder condition and was able to work (Tr. 300).  Plaintiff was on his second tour of duty in Iraq

starting in June 2007; upon returning in 2008 he was transferred to a military treatment facility ("MTF") (Tr. 258, 260, 288, 295, 1729, 1731). Plaintiff presented with foot pain for the last four months on February 8, 2008 and was diagnosed with plantar fasciitis; an x-ray of his foot was normal (Tr. 1658-61). Plaintiff complained of low back pain and left shoulder pain since 2005 on June 24, 2008; he reported having six weeks of physical therapy while deployed, but the pain was still constant and he was referred for MRIs (Tr. 1690). The MRI of Plaintiff's left shoulder on June 30, 2008 showed mild to moderate acromioclavicular joint osteoarthritis, but no other abnormality (Tr. 1749).

On June 27, 2008, Plaintiff reported he had pain in his elbow with movement and sometimes had severe pain in his shoulder and back (Tr. 1682-89). Plaintiff was seen for his lower back and shoulder pain in July 2008 (Tr. 1744-46). The MRI of his elbow that same day showed a small osseous body; but there was no fracture, dislocation, or loose body shown in scans on July 1, 2008 and July 18, 2008 (Tr. 408-10, 478, 481, 484, 1747-48). There was no significant abnormality in Plaintiff's lumbar spine after a scan on July 24, 2008 (Tr. 406, 470). An MRI of Plaintiff's lumbar spine the next day showed minor right foraminal and far lateral disc herniation or prominent bulge at L4-L5, with some contact with the right L4 nerve root suggested; it also showed desiccation and minor loss of disc height but no central or lateral compromise at L3-L4 (Tr. 1677-78).

Plaintiff reported left shoulder pain of seven on a scale of one to 10 when in use on July 17, 2008 and neck pain and stiffness on the left on July 18, 2008; he began physical therapy and received a sleeve for his elbow (Tr. 1607-14, 1619-24, 1627-32). Plaintiff was seen for plantar fasciitis and a toe deformity on July 31, 2008 and was seen for his left shoulder pain on August 1, 2008 (Tr. 1597-1606). Plaintiff's feet had no fractures or abnormalities on August 5, 2008 and he

was again seen for his plantar fasciitis; he received orthopedic inserts (Tr. 405, 467, 1590-92). During his follow up appointment this same day, Plaintiff reported therapy was not helping much, his back pain was still severe, and he had not been getting much sleep even after taking pain medications (Tr. 1593-94). A scan of Plaintiff's shoulders on August 7, 2008 and a CT on August 15, 2008 showed different coracoclavicular distances (Tr. 402-04, 459, 464).

Surgery was not recommended for Plaintiff's spinal problems on August 13, 2008 although the examining physician observed he had a "real problem" (Tr. 1585-86). Plaintiff reported his arch supports for his feet were helping on the same day, but he still had back and shoulder pain (Tr. 1583-84). Plaintiff's pain had improved on August 18 and August 26, 2008 and the brace was helping his elbow; he was continuing with physical therapy exercises (Tr. 1566-67, 1572-73). Plaintiff's pain was worse in September and he sought a second opinion on his back pain (Tr. 1560-63). On October 9, 2008, Plaintiff reported low back pain that had been getting worse and described his pain as six or seven on a scale of one to 10 and the pain was constant (Tr. 308-16). The pain was throbbing while sitting and sharp when he moved from sitting to standing and Plaintiff received an injection (Tr. 313, 316, 401, 421). In October 2008, Plaintiff was also referred to physical therapy, and was told surgery would likely not be beneficial for his shoulder (Tr. 1527, 1533-36). Notes on October 21, 2008 indicate physical therapy had not helped his shoulder pain and he was waiting for more injections for back pain (Tr. 1517-18). Plaintiff continued to attend physical therapy sessions for his low back pain and was given a TENS unit to try (Tr. 1500-03, 1507-08, 1512-14). In November 2008, Plaintiff reported continued back pain and neck pain, but the injections in his shoulder were helping; he was also having trouble rotating from side to side (Tr. 1487-89, 1492-94). Plaintiff continued physical therapy but reported his pain had not decreased and he was having new

hip pain (Tr. 1415-16, 1420-21, 1425-28, 1456, 1473-76, 1483-86).

Plaintiff presented on December 4 and 5, 2008 complaining of chronic shoulder pain since 2005 and desired surgery because the injections had not helped (Tr. 317-18, 1482).  Plaintiff's x-ray and CT showed mild degenerative changes at the AC joint with mild diastasis (Tr. 317-18).  Plaintiff had surgery on his left shoulder on December 8, 2008 and requested medicine for pain (Tr. 319-38, 424-25, 1469-70).  Plaintiff was evaluated for cubital tunnel syndrome on December 17, 2008 but there was no evidence of neuropathy (Tr. 1461-65).  Plaintiff's back pain was better and his shoulder pain was moderate on December 18, 2008, but he complained of neck pain (Tr. 1459-60).  In January 2009, Plaintiff's shoulder pain had improved post-operation (Tr. 1442-44, 1448-50, 1454).  A scan of Plaintiff's cervical spine was normal on January 7, 2009 (Tr. 400, 453).  Plaintiff's pain medication was changed at his request on January 16, 2009 (Tr. 1436-38).  Additional injections to alleviate back pain were planned after a January 28, 2009 appointment and Plaintiff was having low to moderate pain on January 29, 2009 (Tr. 1417-19, 1422-24).  Plaintiff presented on January 30, 2009 with chest pain that resolved with pain medication; a scan of his chest was normal (Tr. 339-47, 399, 450, 1717-22).

In February 2009, Plaintiff began chiropractic care for his neck and back pain, started smoking cessation classes, and continued physical therapy for his shoulder and back, particularly after pulling a muscle in his back (Tr. 1305-15, 1327-29, 1333-35, 1358-63, 1367-69, 1386-91, 1397-1405, 1411-14).  Plaintiff was happy with the results of his shoulder surgery and reported most of his pain was resolved (Tr. 1366).  Plaintiff started aquatic therapy in February 2009 (Tr. 1323-26).  Plaintiff had an allergy consultation on February 19, 2009 due to his cough which he attributed to a dust storm in Iraq; medication was prescribed for the inflammation and smoking cessation was

recommended (Tr. 1252-55, 1316-22). Plaintiff reported improvement in many of his symptoms on February 26, 2009 (Tr. 1301-04). Plaintiff continued physical therapy in March 2009 (Tr. 1248, 1292-94). At his primary care follow up on March 4, 2009, Plaintiff reported daily headaches that ranged in severity, but no severe headaches recently; he had completed the smoking cessation classes and was smoking only a couple of drags on a cigarette; was continuing therapy for anxiety; was receiving chiropractic care for his neck; and still experienced back pain, foot symptoms, insomnia, nervousness, anxiety, hostility, and depression (Tr. 1288-91).

Plaintiff reported improvements in his neck pain and low to moderate back and shoulder pain on March 5, 2009 (Tr. 1285-87). Plaintiff continued physical and occupational therapy (Tr. 1136-38, 1189-91, 1208-10, 1275-84). Plaintiff returned to follow up on his back pain on March 11, 2009 and reported the injections only helped for a few weeks; he underwent further pain management injections (Tr. 348-70, 397, 426-29, 1256-59). Further procedures a week later could not be completed due to pain (Tr. 431-33). Plaintiff was released to full activity post-shoulder surgery on March 31, 2009, but on April 2, 2009 he experienced moderate pain with activity during physical therapy (Tr. 1222-24). On April 10, 2009, Plaintiff reported back pain as five on a scale of one to 10, his headaches as a six, and his shoulder and foot pain as a three (Tr. 1204-07). During his follow up appointment on April 16, 2009, Plaintiff reported his migraines had increased in frequency and severity and he was still having problems with insomnia, but he was feeling better than he did at his last appointment; physical therapy for his tension headaches would begin the next week and Plaintiff was smoking again (Tr. 1142-45). Plaintiff rated his pain as 2.8 on a scale of one to 10 during his chiropractic appointment the same day (Tr. 1139-41).

Plaintiff continued physical therapy throughout April and May 2009 (Tr. 967-70, 974-81,

993-96, 1005-07, 1052-54, 1061, 1079-81, 1099-1101). Plaintiff's headaches were much improved on May 5, 2009; although they occurred daily, he was relatively pain-free (Tr. 990-92). Plaintiff reported his pain at 6.9 on a scale of one to ten at his chiropractic visit May 12, 2009 (Tr. 971-73). On May 14, 2009, Plaintiff reported his back pain was 5/10 and he felt pain with any movement, his feet were hurting at a pain level of 4-5/10 and felt like pins and needles after standing for a few minutes, his headache pain was 6/10, and his shoulder pain was 3/10 (Tr. 951-57). Plaintiff reported similar pain during occupational therapy the same day and was seen for numbness and tingling in his feet the following day; he was referred to physical therapy (Tr. 943-50). Plaintiff reported his pain level at 5.3/10 at his chiropractic appointment (Tr. 940-42). Plaintiff had neurological testing on May 18, 2009 due to numbness in his feet which revealed no evidence of focal mononeuropathy, polyneuropathy, or radiculopathy (Tr. 931-36). Plaintiff attended occupational therapy sessions for his headaches in May 2009 and continued aquatic therapy, other physical therapy, and chiropractic care in May and June 2009 (Tr. 725-35, 803-06, 823-26, 837-41, 851-54, 868-71, 881-84, 893-912, 921-26). Plaintiff's headaches were improved later in May, but he continued to have numbness in his feet upon standing (Tr. 913-16).

Plaintiff began following with Dr. Richard Epter at the Augusta Pain Center for his low back pain in May 2009 (Tr. 1782-1814). Plaintiff reported the pain fluctuated between four and eight on a scale of one to 10, interfered with his sleep, and had been occurring for one year (Tr. 1782-85). Dr. Epter noted evidence of facet mediated pain secondary to spondylosis and recommended injections (Tr. 1784). Plaintiff received injections on May 21, 2009 and June 9, 2009 (Tr. 1786-91). Plaintiff reported some relief from his May 21 procedure (Tr. 859-63). A scan of Plaintiff's right shoulder was normal in June 2009 (Tr. 395, 439). Plaintiff was in a car accident in June that caused

pain in his chest wall and knee (Tr. 798-802, 807-12). On June 18, 2009, Plaintiff reported unsteadiness and a motion sickness feeling on his feet, intense headaches occurring six days a week, but improved sleep; an MRI of his brain was recommended (Tr. 776-81). During his appointment June 23, 2009, he reported four to seven days relief from the June 9 procedure (Tr. 1714-16, 1792-94). Plaintiff's headaches were improved on June 24 and 29, 2009 and his back, shoulder and feet were about the same; he was no longer having dizziness after discontinuing Remeron (Tr. 740-46, 752-58). Plaintiff started smoking cessation classes again in July 2009 and was still having a cough (Tr. 689-92, 698-701, 721-24).

Plaintiff continued therapy, including aquatic therapy, in July 2009 (Tr. 583-87, 592-602, 608-12, 684-88, 702-05). An MRI of Plaintiff's brain on July 10, 2009 was unremarkable besides mild paranasal sinus disease (Tr. 641-48). Plaintiff reported daily migraines on July 21, 2009 and a normal MRI of his brain was reviewed; Plaintiff reported the migraines were triggered by bright light on July 22, 2009 (Tr. 588-91, 613-19). On July 20 and 27, 2009, Plaintiff reported his shoulder was still tight and stiff and his back pain and hip pain continued to be fairly severe; he was also having foot soreness from his knees down to his feet following injections (Tr. 568-71, 620-23). Plaintiff was seen for migraine treatment on July 28, 2009 and on July 30, Plaintiff reported his daily headaches were under control but he still had migraines twice a week; his insomnia was improved and Plaintiff was using a walking stick (Tr. 540-41, 555-58). An MRI of Plaintiff's knees on August 20, 2009 showed mild degenerative changes (Tr. 392-93). Plaintiff received more injections from Dr. Epter on the same date, but at his appointment on September 14, 2009, Plaintiff complained of right hip pain with burning across his thigh (Tr. 1795-1800).

Dr. Horace Ball completed a physical residual functional capacity ("PRFC") assessment on

September 14, 2009 (Tr. 1773-80). Dr. Ball opined Plaintiff could occasionally lift and/or carry up to 20 pounds, frequently lift and/or carry up to 10 pounds, stand and/or walk for a total of six hours in an eight hour day, sit for a total of six hours in an eight hour day, and was unlimited in his ability to push and/or pull (Tr. 1774). Plaintiff should never climb ladders, ropes or scaffolds and should only occasionally climb ramps or stairs or crawl (Tr. 1775). Dr. Ball opined Plaintiff should avoid concentrated exposure to fumes, odors, gases, dust, and hazards (Tr. 1777). Dr. Ball noted Plaintiff's allegations of degenerative disc disease and migraines were partially credible, but his migraines were partially controlled by medication and neither migraines nor asthma had required hospitalization (Tr. 1778). Dr. Ball noted he gave much weight to the opinion of Dr. Redish that Plaintiff could work (Tr. 1779).[1]

An MRI of Plaintiff's left knee on October 6, 2009 showed mild degenerative changes and no evidence of significant internal derangement (Tr. 391). X-rays of Plaintiff's spine on December 10, 2009 showed very mild spondylosis at L4-5 level, suggestion of spondylolysis at L5-S1, and no spondylolisthesis (Tr. 1856). Plaintiff had a neurosurgical consult on December 10, 2009, but surgery was not indicated for his back problems due to no neurological deficits and an essentially normal MRI (Tr. 1867-68).

Dr. John Heard filled out a PRFC form after reviewing Plaintiff's records on January 13, 2010 (Tr. 1830-37). Dr. Heard opined the same limitations as Dr. Ball for lifting, carrying, sitting, standing, walking and pushing or pulling, but he opined Plaintiff could frequently do most postural activities but could only occasionally kneel or climb ladders, ropes or scaffolds (Tr. 1831-32). Dr.

---

[1] As noted above, this statement was not made by Dr. Redish but was instead made by a different physician (apparently named Dr. Bruce) upon referral by Dr. Redish for a second opinion and following Dr. Bruce's physical examination of Plaintiff (Tr. 300).

Heard opined Plaintiff could only reach overhead with his left arm occasionally and should avoid concentrated exposure to hazards (Tr. 1833-34). Dr. Heard noted a statement by Plaintiff on May 6, 2009[2] that his problems had not changed his lifestyle and had started spontaneously in 2005 without an injury[3] and opined his symptoms were real and credible but not as severe as alleged; Dr. Heard also noted he gave much weight to Dr. Redish's statement that Plaintiff could work (Tr. 1832, 1835-36).

## 2. Mental Records

Plaintiff had an appointment with Behavioral Health on June 23, 2008 and recounted issues with anger after his first deployment and stress during the second deployment; he was diagnosed with adjustment disorder with mixed anxiety and depressed mood, and assigned a Global Assessment of Functioning ("GAF") score of 56[4] (Tr. 295-97). Plaintiff participated in an anger management group in July 2008 and a life skills communication group in August 2008 (Tr. 1595-96, 1615-16). Plaintiff agreed to continue with therapy to address his depression and anxiety during a session in August 2008 (Tr. 1568-69). In September, Plaintiff was angry, irritable, dysthymic, and expressed frustration with his situation and physical problems; he was also in denial about the importance of his feelings and his diagnoses were adjustment disorder with mixed emotional

---

[2] It is unclear what record contains this statement, as the only record from May 6, 2009 is a therapy session during which Plaintiff commented on *rearranging* his lifestyle due to psychological symptoms (Tr. 986-88).

[3] It is also unclear when Plaintiff made this statement; one record indicates Plaintiff reported his back problems began in 2005 following his first deployment (Tr. 1690).

[4] A GAF score between 41 and 50 corresponds to a "serious" psychological impairment; a score between 51 and 60 corresponds to a "moderate" impairment; and a score between 61 and 70 corresponds to a "mild" impairment. *Nowlen v. Comm'r of Soc. Sec.*, 277 F. Supp. 2d 718, 726 (E.D. Mich. 2003).

features and chronic PTSD (Tr. 1544-45, 1552-53). Plaintiff continued therapy for PTSD and adjustment disorder in October and November 2008 and was generally doing well with mental symptoms during his case management sessions, although at times he was depressed and worried (Tr. 1487-89, 1492-94, 1497-98, 1504-06, 1509-11, 1515-16, 1519-26, 1528-32, 1537-41). In December 2008, Plaintiff reported decreased symptoms with anger and frustration but was having problems with loss of memory and was concerned with his health issues (Tr. 1466-68, 1479-81). Plaintiff continued therapy in January 2009 and discussed his marital problems (Tr. 1439-41, 1451-53). Plaintiff had a neurological appointment on January 22, 2009 and was prescribed medication for headache syndromes and was referred for treatment of post-concussion symptoms (Tr. 1431-35). After a cognitive evaluation on February 5, 2009, it was recommended that Plaintiff start cognitive therapy, as his memory loss problems were likely associated with PTSD and not concussive injuries (Tr. 1392-96). Plaintiff attended cognitive therapy sessions in February, March and April 2009 (Tr. 1067-73, 1164-66, 1245-47, 1249-51, 1268-70, 1330-32, 1339-41, 1380-82). During a behavioral health assessment on February 9, 2009, Plaintiff was angry about family matters, and wanted to continue therapy (Tr. 1376-79).

Plaintiff submitted to a neuropsychological evaluation on February 17, 2009 with Dr. Scott Mooney (Tr. 1336-38, 1347-52). Dr. Mooney performed a series of tests and opined Plaintiff had average abilities in attention and concentration, average to above average abilities in speed of information processing, had good visual perceptual skills, and high average abilities in some tests on learning and memory but low average abilities in recalling visual information (Tr. 1350-51). Plaintiff's IQ was estimated to be in the lower end of the high average range (Tr. 1351). Dr. Mooney opined there was no implication of a cognitive disorder and diagnosed Plaintiff with ruled

out cognitive disorder, depression, not otherwise specified, headaches, and insomnia (Tr. 1351).

Plaintiff discussed continued marital problems during therapy sessions in March 2009 and was concerned about his health problems; by late April 2009, Plaintiff reported improvement in his marital and mood problems (Tr. 1048-51, 1218-21, 1230-32, 1260-63). Plaintiff participated in an intensive traumatic brain injury ("TBI") functional recovery mental health program starting in April 2009 which included group sessions, occupational therapy sessions, relaxation training, and medication evaluation (Tr. 747-51, 766-70, 872-76, 927-30, 1008-18, 1020-37, 1044-47, 1074-78, 1082-98, 1102-07, 1111-35, 1146-53, 1156-63, 1167-74, 1182-84, 1192-1203). Plaintiff reported continued problems with nightmares and flashbacks and lifestyle changes during a therapy session May 6, 2009, but he and his wife were getting along well (Tr. 986-88). The following week, Plaintiff was depressed and fatigued and was having problems dealing with memories from his deployments (Tr. 963-66). During his psychiatric appointment, he reported having good and bad days and a few days when he did not want to get out of bed; decreased energy and motivation, irritability, and anger; and improved sleep (Tr. 958-62). Plaintiff enjoyed watching TV but could not do other things he used to enjoy, like sports, and was still avoiding people by not going to the store and detaching from others (Tr. 960).

Plaintiff presented with a sad mood during therapy on May 28, 2009, was fatigued, and missed his family; he was still having nightmares and flashbacks and avoiding crowds and people (Tr. 889-92). Plaintiff was irritable and guarded during therapy in June 2009 and reported continued symptoms of depression and anxiety during his medication appointment; his medication was not helping much and it was changed to Remeron (Tr. 736-39, 759-65, 782-85, 817-20, 842-50). Remeron was discontinued due to potential side effects with Plaintiff's equilibrium and dizziness

(Tr. 771-75). Plaintiff continued to be angry, irritable and depressed in therapy on July 1, 2009 (Tr. 717-20). Plaintiff's medications were changed the next day and he was given medication for a short time to try to resolve his anger and irritability (Tr. 709-13). Plaintiff began crying during an occupational therapy session on July 7, 2009, expressed concerns with his decline in function and depression, and could not deny having suicidal thoughts, so a consultation with his psychiatrist occurred (Tr. 680-83). During Plaintiff's next therapy session and psychiatric session he was angry, frustrated and depressed about his medical situation, felt he could not do anything anymore, and stated he did not care if he was alive, dreamed about being dead, and saw himself dead; as a result, Plaintiff agreed to an inpatient hospitalization (Tr. 669-79). Plaintiff spend eight days in the hospital and his mood and anxiety had improved by his next psychiatric appointment on July 16, 2009; he reported a significant benefit from hospitalization and his pain and depression were improved (Tr. 635-40). Plaintiff had a depressed mood at his next therapy session on July 20, 2009 and was concerned about his medical condition (Tr. 630-34). Plaintiff had a depressed mood the morning of July 22, 2009 and discussed financial problems and other stressors (Tr. 603-07). Plaintiff's mood had improved later in the day, although he was having problems sleeping; he was not having suicidal or homicidal ideations (Tr. 577-82). Plaintiff had a depressed mood on July 24 and July 28, 2009 and his diagnoses were chronic PTSD and major depression, single episode, moderate (Tr. 559-63, 572-76). He expressed concerns about transitioning to civilian life (Tr. 575).

Dr. Janet Telford-Tyler filled out a psychiatric review technique form on September 15, 2009 (Tr. 1816-29). Dr. Telford-Tyler opined Plaintiff had mild restrictions in activities of daily living, social functioning, and maintaining concentration, persistence and pace and noted that Plaintiff's function report was credible, but he was independent in daily living, had no major social problems

and no major cognitive limitations, making his mental impairments nonsevere (Tr. 1816-29).

Dr. Jennifer Hewitt filled out a mental impairment questionnaire on November 20, 2009 in which she noted Plaintiff was diagnosed with PTSD and major depressive disorder in 2008 (Tr. 210-12). Dr. Hewitt noted Plaintiff's last mental status exam was mostly normal, but that he sometimes had fluctuations in mood and would be extremely irritable and depressed (Tr. 210). Dr. Hewitt opined Plaintiff was generally able to get along with the public, supervisors and coworkers, but would struggle during periods of increased stress or during tension or conflict with another person (Tr. 212). Plaintiff may be able to adapt to changes in the workplace, but he had a lower tolerance for frustration and at times a volatile mood (Tr. 212). Plaintiff could make simple work-related decisions, but it was somewhat likely he would decompensate or become unable to function due to stress based on past episodes of significant decompensation marked by his suicidal and homicidal ideations (Tr. 212).

Dr. David A. Williams filled out a psychiatric review technique form on January 13, 2010 in which he opined Plaintiff's impairments were not severe because Plaintiff had only mild restrictions in activities of daily living, social functioning, and maintaining concentration, persistence and pace (Tr. 1838-51). Dr. Williams noted diagnoses of PTSD, anxiety and depression but opined Plaintiff had no significant limitation in functioning due to his mental conditions (Tr. 1850).

## III.    ALJ'S FINDINGS

### A.    Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). The process provides:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

**B.      ALJ's Application of the Sequential Evaluation Process**

At step one of the five-step process, the ALJ found Plaintiff had not engaged in any substantial gainful activity since May 21, 2008, the alleged onset date (Tr. 17). At step two, the ALJ found Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine with herniation, migraine headaches, history of asthma, status-post left shoulder arthroscopy, PTSD, and depression (Tr. 17). The ALJ noted he did not find alleged traumatic brain injury or cubical[5] tunnel syndrome to be severe because there was no evidence of brain injury, a negative MRI of the brain, and no diagnosis of cubical tunnel syndrome or significant treatment for the condition (Tr.

---

[5] The condition is called cubital tunnel syndrome (Tr. 1461-65).

17). At step three, the ALJ found Plaintiff did not have any impairment or combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 18). The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform light work in terms of lifting and carrying, but with the following restrictions: Plaintiff needed a cane to walk (but not to stand); could not frequently or repetitively perform bending functions including stooping or crouching; could not reach overhead with his left arm; needed a sit/stand option so he would not be required to walk, stand or sit for more than 10 minutes continuously; could not work at unguarded heights, with or near dangerous machinery, or in other hazardous areas due to side effects from medication; and could not perform work which required focused attention to detailed matters (Tr. 18). At step four, the ALJ found Plaintiff was unable to perform any of his past relevant work (Tr. 21). At step five, the ALJ noted Plaintiff was 37, a younger individual, as of the alleged onset date (Tr. 21). After considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 21). This finding led to the ALJ's determination that Plaintiff was not under a disability since May 21, 2008 (Tr. 22).

## IV.    ANALYSIS

Plaintiff argues the ALJ failed to review and address his combination of impairments to determine whether Plaintiff met one of the Listings. Specifically, Plaintiff argues the ALJ did not properly consider his suicidal ideas, migraines, back and hip pain, left shoulder pain, and PTSD in combination. Plaintiff further argues the hypothetical question posed to the VE was not complete because it did not include all of his vocational limitations and restrictions.

## A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence.  42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted).  If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings.  *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971).  The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility.  *Garner*, 745 F.2d at 387.  The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.  *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review.  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of

error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B. ALJ's Consideration of Plaintiff's Impairments

Plaintiff argues the ALJ committed error at step three of the sequential evaluation because he did not make any explicit finding as to whether Plaintiff met any Listing [Doc. 11 at PageID# 31-32]. Plaintiff asserts that if the ALJ had properly assessed whether Plaintiff met a Listing, he would have found Plaintiff to be disabled due to his suicidal and homicidal ideations, severe and frequent migraines, severe back and hip pain that required the use of a cane, continued left shoulder pain after surgery, excessive absences from work, and chronic PTSD [*id.* at PageID# 33-34]. Plaintiff further argues the ALJ's conclusion that he had no episodes of decompensation was inaccurate, as he was hospitalized twice for suicidal ideations [*id.* at PageID# 35]. As such, Plaintiff contends the ALJ should have reviewed the combination of Plaintiff's exertional and non-exertional limitations and made specific findings; instead, the ALJ played doctor by ruling out migraine headaches and TBI and neglecting to consider absences from work based on migraines and further neglecting to consider all Plaintiff's impairments in combination [*id.* at PageID# 35-36].

The Commissioner argues there is no evidence that Plaintiff would meet a Listing and Plaintiff does not specifically point to any Listing he would have met or the ALJ should have explicitly considered, so any error the ALJ made by not discussing any Listing is harmless [Doc. 13 at PageID# 46]. The Commissioner asserts that Plaintiff's argument that the ALJ did not consider

his impairments in combination is largely focused on his subjective complaints and not on the evidence in the medical records [*id.* at PageID# 47]. The Commissioner argues the citation to Dr. Tyson's record does not establish suicidal or homicidal ideations which would preclude Plaintiff from working, and there is no evidence in the record that Plaintiff had mental issues that would cause work-related limitations for any consecutive 12 month period [*id.* at PageID# 47-48]. As for Plaintiff's migraines and associated absences, the Commissioner argues the treatment notes indicate his headaches were under control with medication and the record does not support the number of absences estimated by Plaintiff [*id.* at PageID# 48, 50]. The Commissioner contends the ALJ addressed Plaintiff's back and hip pain and use of a cane and included these limitations in the hypothetical question posed to the VE; further limitations were not indicated in the medical evidence [*id.* at PageID# 48-49]. Likewise, further limitations attributable to Plaintiff's left shoulder pain were not indicated, and the ALJ included a restriction on overhead reaching in the hypothetical question; therefore, the Commissioner argues it is unclear what other limitations the ALJ should have considered in light of the medical records showing only minimal changes [*id.* at PageID# 50]. The Commissioner further argues the ALJ's decision is supported by the state agency psychological consultants and the state agency physicians, and Plaintiff relies on his subjective complaints without pointing to objective medical evidence to support disability [*id.* at PageID# 50-52].

Essentially, Plaintiff is making a broad argument attacking the ALJ's consideration of the evidence in the record and an alleged failure to consider Plaintiff's impairments in combination. I find the analysis portion of the ALJ's opinion to be somewhat lacking for a record that consists of over 1,800 pages, as the ALJ devoted only about three paragraphs to explicit review of the medical evidence. Certainly, the ALJ need not directly discuss each and every piece of evidence; however,

the absence of discussion or acknowledgment of many records is troubling. Several of the deficiencies in the opinion center on the ALJ's consideration of Plaintiff's mental impairments, as almost the entirety of the ALJ's discussion of the evidence of Plaintiff's mental conditions consists of these statements:

> With regard to PTSD and major depression, the claimant reported improvement with Cymbalta and Klonopin. The claimant reported depression and pain were improving and further reported that he felt a benefit from an inpatient stay in the behavioral unit, for some nine days. The preponderance of the claimant's mental examinations was unremarkable, noting appropriate affect and mood.

(Tr. 19). The "inpatient stay" referenced by the ALJ was apparently Plaintiff's hospitalization in July 2009 following suicidal thoughts (after which the Plaintiff did report improvement in his symptoms), but the ALJ makes no mention of the reason for the hospitalization and does not acknowledge anywhere in the opinion that this hospitalization would qualify as an episode of decompensation. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 ("Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning. . . [they] may be inferred from medical records showing significant alteration in medication; or documentation of the need for a more structured psychological support system (e.g., hospitalizations. . . )"). Moreover, it is not entirely accurate to state that the majority of Plaintiff's mental examinations indicated a normal affect and mood, as many of Plaintiff's mental health treatment records document a sad, depressed, or angry mood.

Although the ALJ implied later in his decision that he was giving fairly significant weight to the opinions of the state agency file reviewers and their determination that Plaintiff's mental impairments were nonsevere (to be quoted *infra*), reliance on these opinions is also flawed. The two psychological file reviewers did review the evidence before them, but they do not appear to have

been provided with the majority of the pertinent evidence. As a result, one file reviewer indicated Plaintiff had no episodes of decompensation, and it is unclear why the other file reviewer did not make any indication as to the number of episodes of decompensation. Both reviews were completed following Plaintiff's hospitalization, but it does not appear from their notes that those records (or, indeed, any significant number of the mental health records now contained in the medical evidence) were included in their review. These opinions, therefore, do not appear to be based on an adequate consideration of the evidence that existed in the record at the time of the review.

After the ALJ's short review of the medical evidence which, in addition to his brief statements about Plaintiff's mental impairments, also included a brief overview of Plaintiff's treatment for physical conditions, the ALJ summarized the evidence as follows:

> In summary, the evidence of record establishes that the claimant served in the Army as a mechanic for 16 plus years. Although there is suggestion of PTSD related to Iraq service and of depression, the evidence described mild symptomatology. The claimant's reported activities of daily living are essentially complete other than [sic] is effected by back and shoulder pain; no indication of social functions being impaired, and he otherwise shows well-maintained concentration except when distracted by pain provoked by arduous activity. He alleges headaches and traumatic brain injury, which has been investigated but MRI of the brain was negative.

> The State Agency notes mental impairments as non-severe and this appears appropriate. However, giving consideration to testimony at the hearing regarding some suicidal ideations, and further considering that he has been treated at the VA for PTSD and depression, I will find that these conditions are severe impairments, and would preclude the claimant from work that requires focused attention to detailed matters.

> The claimant's primary problem is his continued left shoulder limitations despite arthroscopic surgery, and development of back pain with evidence of herniated disc. . . .

> After careful consideration of all the evidence of record, I find that

> while the claimant is precluded from performing past relevant work as a mechanic, he can do other work. . . .
>
> The claimant is a very forthright witness, who may be experiencing some degree of PTSD or depression, so that he honestly perceives himself to be disabled. He did express some recent suicidal ideations. However, his activities of daily living are credibly restricted to at least a moderate degree, and therefore, his mental impairment must be considered severe. He recently has expressed some indication of suicidal ideation. However, the record does not indicate significant functional impairment in vocational terms. It will, nonetheless, be accepted that his attentiveness is affected, and that he cannot now carryout [sic] work that requires focused attention to details.

(Tr. 19-20). This summary is confusing, internally inconsistent, and inconsistent with much of the evidence of mental health impairments in the record. There is more than a suggestion of PTSD and depression in the record, more than mild symptomatology indicated at times, and evidence to indicate more than a possibility Plaintiff is experiencing symptoms related to these problems. In addition, on the one hand, the ALJ states that Plaintiff's activities of daily living are only somewhat affected by his physical problems; on the other hand, the ALJ states Plaintiff's "activities of daily living are credibly restricted to at least a moderate degree, and therefore, his mental impairment must be considered severe" (Tr. 20). The ALJ also inexplicably notes Plaintiff's testimony as to recent suicidal ideations twice without referencing Plaintiff's 2009 hospitalization for suicidal thoughts, and does not connect the dots to explain what these statements have to do with the accompanying statements that Plaintiff had no functional impairments in vocational terms but might have some attentiveness problems.[6] Finally, it is unclear how the ALJ reached the conclusion that Plaintiff's

---

[6] In fact, the restriction against paying focused attention to detailed matters appears to be based on Plaintiff's inability to maintain concentration due to pain provoked by activity and not by any mental health condition.

social functioning was not impaired at all, as notes from Plaintiff's therapy sessions indicated his lifestyle had changed due to hostility, temper outbursts, avoidance of others, and dislike of crowds, most of which was attributable to PTSD, which involved nightmares, flashbacks, and hypervigilence. This was consistent with Plaintiff's testimony during the hearing, at which he described avoiding people and not going out to public places so he could avoid crowds. In addition, Dr. Hewitt's mental impairment questionnaire notes that Plaintiff could have problems getting along with others and might at times exhibit a volatile mood that could impact his ability to adapt to change, but the ALJ did not mention this opinion at all (Tr. 210-12). Given the testimony, statements in Plaintiff's mental health records, and Dr. Hewitt's assessment, a restriction to limited interaction with the general public, coworkers, and supervisors may have been appropriate, but the ALJ simply did not discuss any possible issues with social functioning.

Perhaps these inconsistencies could be explained, or the ALJ's conclusions clarified, if the ALJ had made a specific finding that Plaintiff's subjective complaints of mental health symptoms were not credible. Instead, the ALJ merely made the conclusory statement that "[a]fter careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment" (Tr. 18). The ALJ made no other finding as to the credibility of Plaintiff's subjective complaints. The applicable Social Security Ruling states "[i]t is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.' . . . The determination or decision must contain specific reasons for the finding on

credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). I **FIND** the ALJ did not make sufficient specific findings as to Plaintiff's credibility and, given the inconsistent statements above and this finding, I **CONCLUDE** the ALJ erred in his review and analysis of the evidence of Plaintiff's mental impairments.

The ALJ's consideration of Plaintiff's physical impairments is also flawed. Although the ALJ acknowledged one of Plaintiff's primary problems was his left shoulder pain, there is a fairly significant error replicated throughout the case in the review of the records applicable to Plaintiff's shoulder. In his decision, the ALJ noted that "[a] treatment note for complaints of left shoulder pain from Martin Redish, M.D. dated June 24, 2008, contains a statement from Dr. Redish that he too had a similar condition in his shoulder, and explained to the claimant that he should be able to be employed, as it never stopped him from working. This statement is given significant weight in determining that the claimant [sic] residual functional capacity and capacity for other work, as Dr. Redish is a treating and examining source" (Tr. 19). This error may not be entirely attributable to the ALJ, as the same mistake appeared in the opinions of the state agency physicians who reviewed Plaintiff's file, but the statement being given such significant weight was not made by Dr. Redish and was not made in 2008. It was instead made by a Dr. Bruce after examining Plaintiff one time

upon request by Dr. Redish for a second opinion (Tr. 300).[7]  Therefore, Dr. Bruce would not qualify as a treating physician, although he would qualify as an examining source.

Furthermore, beyond what may perhaps be minor errors in discussing Dr. Bruce's opinion, the statement relied upon does not seem to be an opinion based on objective medical evidence which would be worthy of significant weight, as it is essentially just comparing one individual's problem in a particular context to another individual's (potentially different) problem in a different context. Dr. Bruce's ability to be a doctor with a shoulder problem does not easily equate to Plaintiff's ability to perform work (or, in this particular timeframe, work as a mechanic) with a similar shoulder problem.  *See* 20 C.F.R. § 404.1527(c)(3); 20 C.F.R. § 416.927(c)(3) ("The more a medical source presents relevant evidence to support an opinion, *particularly medical signs and laboratory findings*, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.") (emphasis added).

It is true the ALJ included a restriction on reaching overhead with the left shoulder in Plaintiff's RFC but, by his own words, he relied significantly upon this statement to determine that Plaintiff could perform other work.  In addition, given its questionable worth as an objective medical opinion, it is troubling that both state agency physicians appeared to rely on the statement heavily in their review of the evidence.  Furthermore, Dr. Heard's reliance on a statement by Plaintiff that his conditions had not changed his lifestyle, which cannot be located in the record (at least as being

_____

[7]  The last note from Dr. Redish on November 7, 2006 states "I really want to get another opinion from Dr. Bruce.  If he needs diagnostic arthroscopy I am concerned he will have a possible labral tear that would be best taken care of by Dr. Bruce and we got him an appointment to be seen" (Tr. 300).  The next note, dated December 14, 2006, states, "Anthony is a new patient.  He is *referred in by Dr. Redish*. . ." (Tr. 300).  The note ends with the initials DB, as opposed to initials MR for other notes (Tr. 300).

made on the date noted by Dr. Heard), is also troubling. The applicable Social Security ruling states "the opinions of State agency medical and psychological consultants. . . can be given weight only insofar as they are supported by evidence in the case record, considering such factors as the supportability of the opinion in the evidence including any evidence received at the administrative law judge and Appeals Council levels that was not before the State agency, the consistency of the record as a whole, including other medical opinions, and any explanation for the opinion provided by the State agency medical or psychological consultant. . . ." SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996). Here, the medical and psychological file reviews contain opinions made on a deficient amount of medical records or reliance on problematic statements by Plaintiff or others and, although the ALJ never stated explicitly what weight was given to any of the reviewing opinions, I **FIND** the ALJ's apparent adoption of these opinions was not supported by substantial evidence.

In addition to the flawed consideration of a record pertaining to Plaintiff's left shoulder problem, the ALJ essentially dismissed Plaintiff's complaints of migraines and headaches, referring in his decision to a report that Plaintiff's migraines were controlled by Topamax (Tr. 19). In fact, the records reflect that Plaintiff was having daily headaches for some time and although they eventually appeared to be controlled by medication, he still had migraines once or twice a week (Tr. 540-41, 555-58). State agency physician Dr. Ball noted Plaintiff's migraines were *partially* controlled by medication (Tr. 1778). Plaintiff testified at the hearing to having migraines two or three times a month that might last for up to two days but, again, the ALJ did not make any specific finding as to Plaintiff's credibility to explain his dismissal of such statements. Instead, any problems attributable to Plaintiff's headaches or migraines appear to have been rejected out of hand and not considered along with any of Plaintiff's other impairments. In addition to the ALJ's problematic

consideration of Plaintiff's mental impairments and shoulder pain, I also note problems with the ALJ's consideration of Plaintiff's other physical impairments and thus **FIND** the ALJ failed to properly consider Plaintiff's impairments in combination.

In a case like this, where the sheer volume of the record makes it difficult to parse through and find the most applicable information, file reviewers may not be provided with all pertinent records and it might have been useful to have the claimant submit to a psychological evaluation and a physical examination, both of which could serve as summaries of the claimant's conditions and serve as a baseline for review of other evidence. Here, however, no such examinations were done. Based on the deficiencies in the ALJ's opinion, I cannot conclude the ALJ fulfilled his duty to review the evidence in the record.

An "'ALJ may not select and discuss only that evidence that favors his ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the [] court to trace the path of his reasoning.'" *Lowery v. Comm'r of Soc. Sec.,* 55 F. App'x 333, 339 (6th Cir. 2003) (quoting *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995)); *see also Lambert ex rel. Lambert v. Comm'r of Soc. Sec.*, ___ F. Supp. 2d ___, 2012 WL 966060, at *15 (S.D. Ohio Mar. 21, 2012) (quoting *Lowery*). The ALJ's analysis of the evidence does not allow the reviewing court to trace the path of his reasoning. It may be that the ALJ's ultimate conclusion was correct; however, upon close review of the ALJ's decision and the inadequacy of explanations given for some of his determinations, I cannot conclude the ALJ's conclusion was supported by substantial evidence. I instead **FIND** the ALJ did not adequately consider all the evidence in the record and did not provide sufficient analysis or explanation for his determinations or his ultimate decision. These errors were not harmless and, as such, I **CONCLUDE** the ALJ's decision was not supported by substantial

evidence. Accordingly, I **CONCLUDE** Plaintiff's claim must be remanded to the Commissioner for proper consideration and analysis of the full record of medical evidence of Plaintiff's mental and physical conditions.[8]

## V.      CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I **RECOMMEND** that:[9]

> (1)      Plaintiff's motion for judgment on the pleadings [Doc. 10] be **GRANTED IN PART** and **DENIED IN PART**.

> (2)      The Commissioner's motion for summary judgment [Doc. 12] be **DENIED**.

> (3)      The Commissioner's decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) for action consistent with this Report and Recommendation.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[8] Plaintiff has also raised an argument with respect to the adequacy of the hypothetical question posed to the VE. Because a second review of the evidence may result in changes to the hypothetical question or questions posed to the VE, I do not address that argument here.

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).